UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOE M. EVANS,                      }
                                   }
          Plaintiff,               }
                                   }
v.                                 }          CV 00-AR-2646-S
                                   }
STONE CONTAINER CORP.              }
                                   }                **ENTERED**
          Defendant.               }
                                                APR   1 2002

### MEMORANDUM OPINION

Before the court is a motion for summary judgment filed by
defendant, Stone Container Corp. ("Stone Container").

Plaintiff, Joe M. Evans ("Evans"), instituted this action
against his former employer, Stone Container, on September 19,
2000, asserting claims under Title VII of the Civil Rights Act of
1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*, and
42 U.S.C. § 1981.  Evans claims that his employment was
terminated on the basis of his race.

I.   STATEMENT OF FACTS

Evans, who is black, was first employed in 1979 by Stone
Container at its corrugated box plant in Birmingham, Alabama.[1]

---

[1]All maintenance and production employees who were
compensated on an hourly basis, including Evans, were represented
for purposes of collective bargaining by United Paperworkers
International Union, Local 1704 ("the Union").  The terms and
conditions of employment for these individuals is governed by a
collective bargaining agreement ("CBA") between Stone Container
and the Union.  The CBA provided that excessive absenteeism was
just cause for discharge.  The CBA also prohibited discrimination
against employees on the basis of "race, color, creed, sex,
national origin, or age."



Evans was a clamp truck operator.[2]  He was discharged on October 27, 1998.  Stone Container cites excessive absenteeism as the reason for his discharge.[3]

According to Stone Container, as part of its effort to combat "serious financial difficulties," it instituted a fairly strict "no-fault attendance policy" in September 1997.  The idea was to counter operational problems created by excessive absenteeism.  The attendance policy was posted on the bulletin board at the plant, and a copy was given to each employee.  The new attendance policy eliminated most distinctions between excused and unexcused absences, and it provided for the assessment of points for absences, tardiness, and failure to clock in or out.  Under this attendance policy, the supervisors of production employees were required to report to the Personnel Department when an employee was absent or tardy and when an employee left work early.  The policy provided that employees were to be assessed one-half point for being tardy, and one point

---

[2]Under Occupational Safety and Health Administration rules, clamp truck operators are required to be licensed.  Each shift at Stone Container was assigned one clamp truck operator.  The absence of that operator without notice sufficient to obtain a licensed replacement necessitated the assignment of another licensed operator to work on an overtime basis to avoid interruptions in production.

[3]Glen Smith, Plant Manager of Stone Container's corrugated box plant in Birmingham, made the decision to discharge Evans, and Glen Smith asserts that his decision was based solely on the violations by Evans of Stone Container's policy on absences.

for being absent.[4]  When an employee accumulated specified point

totals within a rolling twelve-month period, designated

disciplinary actions could be imposed:

> -two points: written reminder;
> -four points: verbal warning;
> -five points: written warning;
> -six points: final letter of warning, and suspension of
> three days; "[a]dditional six (6) point levels within any
> 12-month period will result in a written warning and up to
> one (1) day suspension solely at [Stone Container's]
> discretion;"
> -seven points: termination.

Under the policy, the rolling twelve-month period for measuring

points was to begin upon the first assessment of one-half point

or one point.  The policy further provided that "[a]ll points

that are one year old will not be counted for the purpose of

disciplinary action."  In addition to the policy's provisions for

the assessment of points, it provided for the reduction of points

under certain circumstances.[5]

---

[4]When the new policy was implemented, each employee started
with zero points.

[5]Under the first version of the attendance policy, with a
revised date of August 18, 1997, and an effective date of
September 15, 1997, the total number of points accumulated by an
employee could be reduced under the following circumstances:
> Any employee who has three (3) or less points will be
> eligible to remove one (1) point by reporting and
> completing assigned scheduled work for sixty (60)
> straight calendar days, without any charged absences,
> tardies or employee initiated and management approved
> leave earlies. . . . Any employee who exceeds three
> points will no longer be eligible to remove points
> until they either reach six (6) points (as previously
> outlined in the Attendance Program) or lose a point by
> the rolling 12-month rule.

Under the attendance policy, Evans was assessed points on nine different occasions. He had accumulated two points by October 10, 1997; he had been assessed a total of three points by October 20, 1997, and a total of four points by October 31, 1997.[6] By February 5, 1998, his point total was five and one-half; he received a reminder that he was one-half point from a total of six points, which, under the policy, would result in a final letter of warning and a three-day suspension. On May 7, 1998, Evans was given a final letter of warning because he had been assessed an additional point, bringing his total to six and one-half. This letter offered Evans the services of Stone Container's confidential Employee Assistance Program, and it also reminded him that the accumulation of seven points would result

---

A second policy governed Evans during his employment at Stone Container; it was revised on December 22, 1997, and it stated that "[a]ny employee reporting or completing assigned work for thirty days following any charged absences, tardies or employee initiated and management approved leave earlies will have one-half (½) point removed from their attendance record."

[6]Evans refused to sign several of his disciplinary notices. He claims that he refused to sign them because he was incorrectly assessed points in October 1997. Evans was assessed one-half point on October 3, 1997, for being tardy by two hours and twenty-nine minutes, when according to Evans, he actually arrived to work ninety minutes early. Evans argued that he should not have been reported tardy because he was not told to report to work. Stone Container's records indicate that, due to another employee's absence, Evans was told to report to work at 7:00 p.m. and that he failed to do so. Evans claims that any warning based upon a point total including this one-half point assessment from October 3, 1997 is erroneous.

4

in termination of his employment.

As of August 5, 1998, the point total for Evans was five points; he was again reminded that the accumulation of six points would result in a final letter of warning. By August 28, 1998, he had accumulated six and one-half points; he was given a final letter of warning and a reminder that the accumulation of seven points would result in termination of his employment. A third final warning letter and reminder regarding his impending termination was given on October 6, 1998, when the point total for Evans had once again reached six and one-half.[7]

Evans arrived to work late on October 21, 1998; this tardy arrival resulted in the accumulation of seven points.[8] Consequently, Evans was suspended while his personnel record was verified for accuracy. When it was determined that seven points had correctly been assessed to Evans, his employment was terminated on October 27, 1998. Stone Container never suspended

---

[7]Stone Container argues that it sent several letters to Evans reminding him of the attendance policy and of the consequences for absences. Specifically, Stone Container argues that it sent Evans a total of three final letters of warning. Stone Container further argues that Evans never sought any assistance and never filed any grievances regarding the warnings he received.

[8]In his memorandum in opposition to Stone Container's motion for summary judgment, Evans appears to argue that the assessment of this seventh point is erroneous because the failure of Dillard to remove any points from his point total in the twelve months preceding this seventh point constitutes one of the methods by which the attendance policy was discriminatorily administered.

5

Evans pursuant to the progressive disciplinary measures of the attendance policy.[9]  In fact, Stone Container never enforced the suspension stage of the attendance policy against any employee.[10]

Following his discharge, Evans filed a grievance under the CBA.  During the grievance process, the Union alleged that Stone Container's supervisors had not kept accurate attendance records.  Because of this allegation, Stone Container conducted an audit of its attendance records for the preceding twelve months.  This audit was conducted in January 1999, by Joyce Dillard ("Dillard"), Stone Container's Personnel Manager.  As part of the auditing process, Dillard reviewed the time cards of all Stone Container employees.  Through the audit, Dillard discovered that the attendance records forwarded to and maintained in the Personnel Department reflected that three employees had been assessed too many points.  Dillard also discovered that 47 employees had been assessed too few points; Evans was one of those 47 employees.  The audit showed that some absences and

---

[9]Evans claims that, because he had not been suspended for the three days as required under the penultimate step of the progressive discipline policy, he did not know he was subject to discharge.  To rebut this claim, Stone Container argues that Evans knew further absences and tardies would result in discharge, even without first imposing a three-day suspension, because Evans was told on August 28, 1998, and October 6, 1998, when he received final warning letters, that he was on the verge of termination under the policy.

[10]According to Stone Container, the decision was made that suspension was an imprudent form of discipline, given the need of having employees actually present for work.

tardy arrivals by Evans had not been reported to Stone
Container's Personnel Department.  Had these absences and tardy
arrivals been properly reported, four additional points would
have been assessed; therefore, the point total for Evans in the
twelve-month period preceding his termination should have been
eleven, which is four more points than the number requiring
discharge.

Evans, however, was not the only employee whose absences and
tardy arrivals had not been reported to the Personnel Department;
the point totals for the other employees should have been at
least seven.  These employees were Stanley Kight,[11] a white male,
and Troy Burrow, Quinton Gaiter, James Johnson, Willie Johnson,
Larry Milton, Isaac Peoples, and Steven Thomas, all seven of whom

---

[11]The parties do not dispute that Kight, according to the
audit's results, had the requisite number of points for
termination and that Kight was not discharged.  Stone Container
argues that Kight was not discharged upon the revelation that he
had seven points because he had not received a final letter of
warning.  Evans disputes this explanation and claims that Kight
received a final warning letter on September 22, 1998.  Evans
produced to the court a copy of the final letter of warning
issued to Kight on September 22, 1998.  This letter informed
Kight that he had six points and that the assessment of an
additional one point would result in termination of his
employment.
Evans also uses Kight's attendance record and the subsequent
discipline (or the lack thereof) to illustrate how the attendance
policy was disparately administered.  Evans claims that Kight was
allowed to leave work early a total of six times during May 1998,
in June 1998, and in August 1998, without being assessed any
points.  Kight was allowed to leave early in these instances
purportedly because of a lack of work.  Evans argues, however,
that "there was never lack of work in a facility which is
operating twenty-fours [sic] a day."

are black.[12]  According to Stone Container, these employees, totaling eight in number, had not received the warnings required under the progressive disciplinary provisions of the attendance policy because of the inaccuracies in reporting.  Consequently, although these employees were discharged on January 13, 1999, they were immediately reinstated under an agreement with the Union because they had not received the aforementioned required warnings.[13]  (Hereinafter, these eight employees are collectively referred to as "the reinstated employees.")  Each of the reinstated employees had fewer absences than Evans.  It is undisputed that Evans had more absences and points under the attendance policy than any other employee.

Evans claims that the audit also revealed there were other white employees who had at least seven points, but who were never

---

[12]The following table explains the point totals for the reinstated employees:

| Name | Race | Pre-Audit | Post-Audit |
|------|------|-----------|------------|
| Stanley Kight | White | 5 ½ | 7 |
| Troy Burrow | Black | 7 | 8 |
| Quinton Gaiter | Black | 5 ½ | 9 ½ |
| James Johnson | Black | ½ | 7 |
| Willie Johnson | Black | 7 | 8 |
| Larry Milton | Black | 5 | 8 |
| Isaac Peoples | Black | 2 ½ | 8 ½ |
| Steve Thomas | Black | 3 | 7 |

[13]In addition to offering reinstatement, this agreement between Stone Container and the Union provided that, upon reinstatement, these particular employees would be assessed points at the level of progressive discipline at which they were last warned before the audit disclosed the unreported and uncharged points.

8

permanently or temporarily discharged.  Evans asserts that,

following the audit, Dillard failed to change the point totals

for these individuals, thereby precluding their placement on the

list of individuals to be discharged (hereinafter, "the discharge

list").  These employees included Ray Frost,[14] Kevin Hunt,[15]

William Kirby,[16] Harbert Kuykendall,[17] Kelly Weaver,[18] Joel

---

[14]Dillard explains that the absence of Ray Frost's name on
the discharge list was due to her personal error, but she admits
that his point total after reconciling the audit records should
have been over seven points.

[15]Dillard admits that Kevin Hunt had seven points following
the audit.  Hunt was neither discharged nor placed on the
discharge list.

[16]Evans claims that, following the audit, William Kirby had
more than seven points.  He further asserts that Dillard claims
in her affidavit that he had only six points, while her notes
reflect that he had seven and one-half.  Dillard explains that
her affidavit testimony was incorrect, due to her failure to
double-check for accuracy when she reconciled the point totals.
     Evans contends that the failure to assess points for some of
Kirby's tardies supports his claim of disparate treatment:
"Notably on 10/09/1998, Kirby's time card reflects that he was
forty-one minutes late to work and not officially charged with a
tardy. . . . At the time, the computerized record does not charge
Kirby with an absence.  After the audit Dillard noted by hand
that in he face [sic] that he was forty-one minutes late.
Kirby's ability to circumvent the attendance policy can be
compared to Evans' experience.  A week earlier on 10/02/1998,
Evans on the same 11:00-7:00 shift, was twelve minutes late to
work.  Evans computer record reflects that he was charged a tardy
and was one step closer to termination."  (Plff.'s Memo. Opp.
Def.'s Mot. Summ. J. Corrected Copy, at 9.)

[17]Kuykendall's point total after the audit was seven, and
thus, according to Evans, he should have been discharged.
Dillard admits that he should have been assessed a total of seven
points, thereby warranting termination, but she testified that
she did not know why he was not listed for discharge.

[18]Stone Container argues that Weaver should have been placed

Wilemon,[19] Marvin Wilson,[20] and Richard Grigsby.[21]

The Union asked Stone Container to consider reinstating Evans pursuant to the same terms under which the other eight employees were reinstated, but Stone Container refused because Evans had received all of the warnings required under the attendance policy.  Stone Container did agree, however, to

---

on a list for discharge because, while her point total did not change after the audit, she had seven points.  Dillard testified that Weaver's employment could not have been terminated because of FMLA issues.

[19]Evans argues that, following the audit, Joel Wilemon, had "significantly more absentee points than had been assessed against [Evans]," and therefore, that he should have been placed on the list for discharge and should have been discharged.  But the evidence reveals that Evans had more absences and points than any other employee.

[20]Evans argues that Marvin Wilson's attendance record and point total is another illustration of how white employees were treated more leniently under the disciplinary provisions of the attendance policy.  Wilson's point total was seven following the audit, yet his employment was not terminated.  Evans asserts that "Wilson was also excused exempt from the absence program due to repairs at his home [i.e., a leaking roof] on September 25, 1997," the same day that Evans was assessed one-half point for being late to work by nineteen minutes.  To explain how Wilson avoided the assessment of points, Evans quotes Dillard's deposition testimony: "And again on this I would have to go back and look and see if this was when we had one of the major floods or something that a lot of people had damage with.  If they did, at that point I think management made a decision not to charge anybody because we had several of those but I don't remember exactly what time it was."  Evans asserts that "under a no-fault attendance program, Wilson would have been assessed a point in connection with this absence.  Alternatively, Evans argues that "the same flood that caused Wilson's roof to leak could have caused Evans to be late to work."

[21]Dillard concedes that Richard Grigsby had seven points following the audit and that he was not discharged.

reinstate Evans under a "last chance agreement."[22]   This
agreement was proposed to Evans on March 29, 1999, but he
declined to accept its terms.   His grievance was subsequently
submitted to arbitration.[23]

Not only did Evans protest his termination during the
grievance procedures, but he also filed a charge of employment
discrimination with the EEOC.   As part of his charge, Evans
argued that the warning notice issued by Stone Container on
September 25, 1998, indicated that he had fewer points than
required for termination.   Although this warning notice indicated
that one-half point would be subtracted from his point total on
September 27, 1998, if there were no intervening absences, the
failure of Evans to report to work punctually on October 2 and
October 21, 1998, resulted in the assessment of additional
points, thereby bringing his point total to seven--and these
seven points were the basis of his termination.   Evans also

---

[22]The agreement imposed the following conditions: Evans was
required to pass a drug screen before returning to work; six
points would remain on his record and his point total could not
be reduced as provided in the attendance policy for a period of
sixty days; he would be placed on probation for sixty days; he
would be assigned to the first shift utility job at the utility
rate of pay for sixty days;  and he would, at the end of
successful completion of the sixty-day period, return to the
third shift as a clamp truck operator and receive backpay for the
difference between the utility rate and the operator rate.

[23]The arbitration hearing was held on November 12, 1999.   The
arbitrator found that there was no evidence of discrimination or
partiality on the basis of race or any other reason, and he
concluded that Stone Container discharged Evans for just cause.

claimed in the EEOC charge that he had fewer points than other employees who were not discharged.[24]  Stone Container asserts that no employee, white or black, had absences during the period in question which resulted in as many points as Evans.[25]  On June 31, 2000, the EEOC dismissed the charge filed by Evans.

During the course of the instant litigation, in response to interrogatories served by Stone Container on Evans, Evans explained that his complaint and his EEOC charge spelled out the "wrongs" forming the basis of his civil action.  In his complaint, Evans alleges but Stone Container denies that it permitted white employees with records "no better, or even worse, to continue working," including Stanley [Kight], Richard [Grigsby], Billy Conrad, Marvin Wilson, and others."  (Compl. ¶ 11.)  Evans specifically asserted, during discovery, that Kelly Weaver, Stanley Kight, Billy Conrad, Marvin Wilson, Bryan Dillard, and William Kirby are the white employees who had

---

[24]The employees listed in the EEOC charges as having more absences and more points than Evans included Kelly Weaver, Stanley Kight, Richard Grigsby, Billy Conrad, Marvin Wilson, Bryan Dillard, and William Kirby.

[25]According to Stone Container's records, the post-audit point totals for the white employees listed in the EEOC charge are as follows: Kelly Weaver, 4; Stanley Kight, 7; Richard Grigsby, 7; Billy Conrad, 6 ½; Marvin Wilson, 7; Bryan Dillard, 2 ½; and William Kirby, 6.  Stone Container also asserts that none of the following black employees were permanently discharged, even though their post-audit point totals exceeded seven: Willie Johnson, 8; Larry Milton, 8; Isaac Peoples, 8 ½; Quinton Gaiter, 9 ½; and Troy Burrow, 8.

attendance problems but who were not discharged, who were allowed
to return to work without the imposition of any conditions, and
who were allowed to be absent "without receiving write-ups."
Stone Container points out that these alleged comparators did
not, at the times relevant to this litigation, have attendance
problems that were similar to or worse than the problems of
Evans.  Stone Container further argues that these individuals are
not proper comparators because the number of instances of their
absences had been understated in reports to the Personnel
Department and because the required progressive discipline had
not been imposed upon them.

Stone Container claims that its audit revealed no racial
pattern in how or to what extent points and absences had been
understated.  In support of this contention, Stone Container
asserts that, in the group of the eight reinstated employees, the
seven black employees were undercharged an average of 3.65
points, while the white employee was undercharged 1.5 points.
Stone Container also asserts that the overall average number of
points that white employees were undercharged was 1.325 points,
while the same number for black employees was 1.759.

Stone Container next offers statistical evidence to rebut
the allegation that Evans was discriminatorily discharged on the
basis of race.  Between February 1, 1998, and February 1, 2001,
44.7% of the 188-person workforce in Stone Container's bargaining

13

unit was white, 54.3% was black, one person was Hispanic, and one person was Asian-American.  Between February 1, 1998 and May 1, 2001,[26] six white bargaining unit employees were discharged and six black bargaining unit employees were discharged.  Since Stone Container implemented its attendance policy on September 15, 1997, four white bargaining unit employees and five black bargaining unit employees have been terminated for excessive absenteeism.  Thus, the percentage for black employees discharged for excessive absenteeism is 55.5%, a number approximating the percentage of black employees in the bargaining unit.

## II.   DISCUSSION

Under Title VII and § 1981, a termination of employment on the basis of race constitutes an unlawful employment practice. Evans alleges that his discharge constitutes violations of both statutes and that this termination constituted disparate treatment.  Specifically, he argues that Stone Container "does not subject white employees to discipline policies in the same manner as African-American employees."  He also argues that Stone Container discriminated against him because of his race in the administration of its attendance program, in keeping inaccurate records, and in imposing discipline under the attendance policy.

In the context of disparate treatment claims, Title VII and

---

[26]These are the dates of the three-year period beginning 180 days prior to the discharge of Evans.

§ 1981 "have the same requirements of proof and use the same analytical framework;" thus, courts have typically addressed the Title VII claim with the understanding that "the analysis applies to the § 1981 claim as well." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Consequently, the following discussion applies equally to both the Title VII and the § 1981 claims.

A prima facie case of discrimination can be established by the plaintiff's offering of direct evidence of discrimination, statistical proof of a pattern of discrimination, or circumstantial evidence to prove discriminatory intent, using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Direct evidence of discrimination would be evidence, which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989) (citations omitted). The evidence offered by the parties does not constitute direct evidence. Although statistical and anecdotal evidence is before the court on this Rule 56 motion, this evidence does not rise to the level of establishing a pattern and practice of racial discrimination. Consequently, all evidence before the court is best analyzed under the tripartite allocation of evidentiary production used to circumstantially prove discrimination under *McDonnell Douglas*.

15

Under the *McDonnell Douglas* paradigm, the plaintiff must prove by a preponderance of the evidence a prima facie case of race discrimination.  The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for terminating the plaintiff's employment.  The plaintiff is then given the opportunity for rebuttal to show by a preponderance of the evidence that the articulated reason offered by the defendant is pretextual.  Throughout this analytical framework, the plaintiff retains the ultimate burden of persuasion that he has been the victim of intentional discrimination.  *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981)

A.   Prima Facie Case of Discrimination

To establish a prima facie case of racial discrimination, the plaintiff must show: (1) that he belongs to a distinct racial group; (2) that he was subjected to an adverse employment action; (3) that his employer treated similarly situated employees outside his classification more favorably; and (4) that he was qualified to do the job.  *See McDonnell Douglas*, 411 U.S. at 802. "The central inquiry in evaluating whether the plaintiff has met his initial burden in a Title VII case is whether the circumstantial evidence presented is sufficient to create an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).  When a plaintiff establishes a prima

16

facie case, a presumption that the plaintiff was the subject of intentional race discrimination arises. *Burdine*, 450 U.S. at 254.

Turning to the question of whether Evans has established a prima facie case, Evans, a black employee who was discharged, has undoubtedly met the first and second elements. The primary inquiries for discussion are whether Stone Container treated non-minority, similarly situated employees more favorably and whether Evans was qualified for his position. The Eleventh Circuit, in discriminatory termination cases, permits courts to infer, for purposes of satisfying the prima facie case, that an employee is qualified for the position from which he was discharged when that employee "'has held a position for a significant period of time.'" *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) (quoting *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987)). Evans argues that his nineteen-year tenure at Stone Container's corrugated box plant gives rise to the inference that he was qualified for the job. Though Stone Container argues that the multiple absences and tardies by Evans render him unqualified, and although these arguments could indeed be meritorious, the court declines to agree with Stone Container in this argument. The court, when viewing the evidence in the light most favorable to Evans, agrees that his nineteen-year tenure at Stone Container renders him

17

"qualified" for his position.

To establish a prima facie case, Evans must also prove that Stone Container treated similarly situated employees outside his classification more favorably.[27]

> To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant aspects. . . . In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or are accused of the same or similar conduct and are disciplined in different ways.

*Holifield*, 115 F.3d at 1562 (internal citations omitted).  In the context of allegations of discriminatory discipline, "'the most important variables . . . are the nature of the offenses committed and the nature of the punishments imposed.'"  *Jones v. Gerwens*, 874 F.2d 1534, 1539-40 (11th Cir. 1989) (citations omitted).  The Eleventh Circuit additionally requires "that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

---

[27]When a plaintiff seeks to prove racial discrimination by presenting evidence that similarly situated, non-minority employees were treated more favorably, the burden is on the plaintiff "'to show a similarity between [his] conduct and that of white employees who were treated differently and not on [the defendant] to prove their similarity.'"  *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (citations omitted) (alteration in original).

18

In his memorandum in opposition to Stone Container's summary judgment motion, Evans identifies various white employees as alleged comparators.  Stone Container argues that Evans has failed to identify any employees who were treated more favorably than he was under similar circumstances.  Specifically, it contends that the reinstated employees offered by Evans as comparators are not similarly situated because none had been absent or tardy as many times as Evans and because none had received the warnings required by the attendance policy prior to discharge.  Regardless of the factual differences between Evans and the aforementioned alleged comparators, the court will assume, without deciding, that, for purposes of the prima facie case, these individuals are similarly situated.  Because of the nature of the evidence before the court, any disputes regarding the propriety of the alleged comparators are best analyzed under the pretext stage of the burden-shifting scheme.  Therefore, because Evans is a black whose employment was terminated by Stone Container, because the court infers from his tenure at Stone Container that Evans was qualified for his position, and because the court assumes at this stage of the analysis that Stone Container treated white employees with at least seven points more favorably, the court concludes that Evans has established a prima facie case of discrimination.

B.   Legitimate, Non-Discriminatory Reason for Termination

Upon the demonstration of a prima facie case, the burden of production[28] shifts to the defendant to rebut this presumption of discrimination by presenting a legitimate, non-discriminatory reason for the employment action taken against the plaintiff. *Holifield v. Reno*, 115 F.3d at 1564 (citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981)).  The explanation provided must be legally sufficient to justify a judgment for the defendant.  If the defendant carries this burden of production, the presumption of discrimination raised by the prima facie case drops from the case, and the factual inquiry proceeds to a new level of specificity.  *Burdine*, 450 U.S. at 254-55 (footnotes and internal citations omitted).

Stone Container argues that "[p]laintiff's poor attendance, i.e., as defined in Stone Container's policy on the subject, was the cause of [p]laintiff's ultimate termination, which is a legitimate, non-discriminatory reason for an employer's decision."  (Def.'s Brief Supp. Summ. J., at 31.)  In support of this contention, Stone Container points out that Evans had more absences and points under the policy than any other employee and that Evans had been cautioned in at least three final letters of warning that the repeated absences and the continued accrual of

---

[28]The burden placed upon the defendant to articulate a legitimate, non-discriminatory reason is not a burden of persuasion; it is, however, a burden that can be discharged only through admissible evidence that clearly explains the defendant's proffered reasons.

points would result in termination of his employment.  Stone
Container further argues that its reason for discharging Evans is
not discriminatory because Stone Container terminated the
employment of four white and five black employees for excessive
absenteeism under the policy.  Consequently, because courts have
recognized that it is reasonable for an employer to require its
employees to attend work on a regular basis, and because it is
not disputed that Evans failed to meet Stone Container's minimum
attendance requirements, the court finds that Stone Container has
articulated a legitimate, non-discriminatory reason for
discharging Evans.  *See Bush v. Commonwealth Edison Co.*, 990 F.2d
928 (7th cir. 1993).

Relying upon the standard enunciated in *Burdine*, that, in
order to rebut a prima facie case, the explanation provided by
the defendant must be legally sufficient to justify judgment for
it, Evans says that summary judgment is inappropriate because
there are "disputed facts in regard to the racial equity in the
operation of the attendance program."  Thus, Evans seems to be
admitting that Stone Container's reason for discharging him is
legitimate.  However, Evans appears to be arguing that Stone
Container's reason for his discharge is discriminatory, thereby
precluding the court from granting summary judgment in favor of
Stone Container.

Evans argues that Stone Container was motivated by

21

discriminatory animus in discharging Evans and that this unlawful animus manifests itself in Stone Container's failure to monitor its white employees as closely as its black employees.  However, the evidence provides no support for this argument.  Five black employees and four white employees had been discharged for excessive absenteeism under the attendance policy; translating these numbers into percentages based upon the racial composition of Stone Container's workforce, one can see that the percentage of black employees discharged for excessive absenteeism roughly equals the percentage of black employees in the workforce. Furthermore, if any racial group benefitted from Stone Container's alleged inequitable operation of the attendance policy and from its failure to monitor its employees, then the black employees were the recipients of such advantages.  Of the eight reinstated employees, the only white employee was undercharged only 1.5 points, while the black employees were undercharged an average of 3.65 points.  These undisputed numbers strongly suggest that the black employees were treated more leniently under the attendance policy in that their absences and tardies were not reported as often as the absences and tardies of white employees.  Of the entire workforce, white employees were undercharged an average of 1.325 points while the black employees were undercharged an average of 1.759.  Again, these numbers would indicate that if Stone Container favored any group of

employees, then it favored the black employees.

To support his claim that the attendance policy was administered unfairly to black employees, Evans points to what he characterizes as more lenient treatment of Stanley Kight, Richard Grigsby, and Marvin Wilson, all white employees.  Kight was reinstated even though his post-audit point total was seven and even though he had received at least one final letter of warning. Stone Container's failure to terminate Kight's employment and its reinstatement of Kight is not evidence that Stone Container favored him as a white employee, when it is undisputed that Stone Container also reinstated seven black employees whose point totals were at least seven.  This conclusion is not altered by the fact that Kight had received one final warning letter because, as discussed in more detail below, Kight had received only one final letter while Evans had received at least three final warnings.  Wilson was allowed to leave early for repairs to his roof following recent flooding without the assessment of points, while Evans was charged points on that same day.  The evidence indicates that Stone Container made a blanket decision to not assess points to those employees whose attendance was affected by the flooding.  Evans wants to avail himself of this non-enforcement decision by Stone Container, even though he never provides any evidence that he was entitled to apply this exemption to his situation; Evans does not offer evidence to show

that he was one such employee affected by the flooding.
Therefore, the comparison between the treatment of Wilson and
Evans cannot be used to demonstrate any discriminatory animus by
Stone Container.  Evans does not explain how Stone Container's
conduct in allowing Grigsby to leave early for lack of work
constitutes discrimination or inequitable operation of the
attendance program other than to argue that there is never a lack
of work to do in a plant that operates twenty-four hours a day.
Because he fails to show that he was never allowed to leave work
early when there was a lack of work, the comparison between Evans
and Grigsby also fails.

The only burden placed upon Stone Container at this stage of
the analysis is to articulate a legitimate, non-discriminatory
reason.  The court finds that Stone Container has satisfied this
burden because it is undisputed that the point total for Evans
had reached the level at which termination was dictated as the
appropriate disciplinary measure under the attendance policy.

C.   Pretext

Where a defendant meets its burden of articulating a
legitimate, non-discriminatory reason, as it has done here, the
plaintiff is given the opportunity to rebut the defendant's
articulated reason by demonstrating that it is mere pretext for
discrimination.  *See Holifield*, 115 F.3d at 1565.

> This demonstration merges with the plaintiff's ultimate
> burden of showing that the defendant intentionally

24

> discriminated against the plaintiff.  Put another way,
> once the employer succeeds in carrying its intermediate
> burden of production, the ultimate issue in the case
> becomes whether the plaintiff has proven that the
> employer intentionally discriminated against him
> because of his race.

*Id.* (internal citations omitted).  Thus, the focus of the case at

this stage is on the employer's "subjective intent and the

motivation behind the defendant's adverse employment actions

directed at [the employee]." *Harris v. Shelby County Board of

Education*, 99 F.3d 1078, 1084 (11th Cir. 1996).  In persuading

the court that he has been the victim of intentional

discrimination, the plaintiff may succeed "either directly by

persuading the court that a discriminatory reason more likely

motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence."

*Burdine*, 450 U.S. at 256.  Evans attacks Stone Container's reason

for discharging him in both manners.

To argue that discrimination, rather than absenteeism, more

likely motivated Stone Container's termination of his employment,

Evans relies upon the arguments that similarly situated white

employees were treated more favorably than he was and that

"numerous inconsistencies in the defendant's rationale for Evans'

[sic] termination require a jury to make the ultimate conclusion

whether race was a factor." (Plff.'s Memo. Opp. Summ. J., at

20.)  Turning to the comparators offered by Evans, and

recognizing that the comparators' misconduct must be similar in

25

both quality and quantity, the court cannot find that any of these white employees are truly similarly situated to Evans.  And if Evans cannot point to similarly situated employees who were treated more favorably by Stone Container, then Evans has failed to establish that anything other than excessive absenteeism motivated it when it discharged Evans.

Throughout various points in the litigation, Evans has compared his treatment under the attendance policy to Stone Container's treatment of the following white employees: (1) Kelly Weaver, (2) Richard Grigsby, (3) Billy Conrad, (4) Marvin Wilson, (5) Bryan Dillard, (6) William Kirby, (7) Ray Frost, (8) Kevin Hunt, (9) Harbert Kuykendall, (10) Joel Wilemon, and (11) Stanley Kight.  None of these employees had more absences and tardies than Evans.  The only employee that approaches similarity to Evans in terms of employee misconduct is Kight, the only white employee in the group of the eight reinstated employees.  Evans claims that Kight had more absences and points than he did; but the undisputed evidence shows that prior to the audit, Kight had five and one-half points, and following the audit, Kight had seven points.  Additionally, Evans correctly asserts that Kight had received one final letter of warning.  Because Kight had received this warning and thus because he knew that the accumulation of additional points would result in his discharge, Evans argues that Kight is a non-minority employee who was

similarly situated to him but who was more favorably treated
because he was reinstated after his post-audit discharge, when
Stone Container failed to do the same for Evans.  The court is
not persuaded by this argument.  The logic of his argument breaks
down when one considers that **Kight** had received **only one** final
letter of warning while **Evans** had received **three**; this fact
precludes the court from finding that Kight and Evans were
similarly situated.  Consequently, the court cannot conclude that
there is a genuine issue of disputed fact warranting denial of
Stone Container's motion for summary judgment.

In his EEOC charge, his complaint, and in discovery
responses, Evans claims that Kelly Weaver, Richard Grigsby, Billy
Conrad, Marvin Wilson, Bryan Dillard, and William Kirby had more
absences and points than he did.  This claim fails, however,
because, following the audit, none of these employees had greater
than seven points, while Evans had eleven points.  Though the
misconduct by these employees is similar to that of Evans in that
all were absent or tardy on multiple occasions, the similarity
ends there.  This court cannot logically reach the conclusion
that the quantity of the offenses is similar when Evans, to reach
eleven points, was either absent four more days or tardy at least
eight more times (or some combination in between) than these
white employees.  Furthermore, of these employees with seven
points, none had received a final letter of warning as required

27

under the attendance policy's progressive discipline provisions;
Stone Container, in adhering to its attendance policy, could not
discharge those employees who had not been warned.  Consequently,
those individuals listed in the EEOC charge, the complaint, and
the discovery responses are not similarly situated for purposes
of proving that Stone Container's reason for discharging Evans
was pretextual.

Evans, as a last ditch position, offers another set of
comparators.  Evans points to a set of employees who, according
to him, were not placed on a list to be discharged and were not
ultimately discharged because Dillard failed to change their
point totals after the audit:  Ray Frost, Kevin Hunt, William
Kirby, Harbert Kuykendall, Kelly Weaver, Joel Wilemon, Marvin
Wilson, and Richard Grigsby.  As discussed in the footnotes to
the statement of facts, each of these white employees appears to
have had seven points following the audit.  The court cannot
agree with the contentions by Evans that the failure to name
these white employees to a discharge list and that the failure to
terminate their employment constitutes more favorable treatment.
Although Dillard's omissions and failures prevented these
employees from having their employment terminated, these
employees would not likely have been discharged in the end.  Had
these employees been included on a discharge list or had they
been discharged, they likely would have been reinstated along

28

with the other eight reinstated employees because their pre-audit point totals were less than seven and because they had not received the warnings that must be issued prior to termination. Thus, the court is faced with the same analysis as discussed above.  As with the first set of comparators, the court cannot conclude that they are similarly situated to Evans because these individuals did not have the requisite number of points for termination before the audit when Evans had seven, because they had only seven points following the audit whereas Evans had eleven, and because they had not received the warnings that must be issued prior to termination.

In his next-to-last argument, Evans contends that the various inaccuracies and errors in Stone Container's personnel records and in the way the attendance policy was administered, the specific details of which will not be repeated here, reveal that Stone Container's legitimate non-discriminatory reasons for its employment actions are pretextual because they are not worthy of credence.  An employer's legitimate, non-discriminatory reason can be attacked as unworthy of credence by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence.'"  *Standard*, 161 F.3d at 1333 (alteration in original) (quoting *Combs v. Plantation Patterns,*

29

*Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997)). However, any inconsistencies, contradictions, inaccuracies, or errors found in the personnel records do not automatically render Stone Container's legitimate reasons for its employment decisions unworthy of credence.

The Eleventh Circuit has repeatedly held that the important inquiry is not whether the plaintiff is actually guilty of misconduct, but whether, at the time of the adverse employment action, the employer genuinely believed that the plaintiff had engaged in misconduct. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). In other words, for its legitimate reason to carry the day, the employer need not have been correct in its assessment of the employee's poor performance or misconduct; it need only have believed in good faith that the employee's performance was unsatisfactory or that the employee had committed misconduct. *See Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982); *Smith v. Papp Clinic*, 808 F.2d 1449, 1452-53 (11th Cir. 1987). It follows from these statements of law that, if mistaken but honest and good faith beliefs by the employer regarding the plaintiff's misconduct and poor performance can be excused as non-pretextual, then mistaken and erroneous beliefs by the employer regarding the misconduct and poor performance of other employees will not automatically render the employer's reasons for its employment decisions mere

30

pretext when those reasons are based on errors, so long as the employer honestly and in good faith held those beliefs.  Although one could ascertain how Dillard's errors in the auditing process and how any inaccuracies in Stone Container's personnel records could favor some employees while disadvantaging others, this court cannot detect any discriminatory motive or racial animus from these errors and inaccuracies.  More importantly, Evans has failed to offer any proof to create a genuine issue of material fact regarding whether these errors render Stone Container's legitimate non-discriminatory reason unworthy of credence.

In a final attempt to convince the court that Stone Container's decision to discharge Evans was motivated by racial animus, Evans highlights the failure of Stone Container to suspend him before terminating his employment.  Neither pretext nor a discriminatory motive can be established from Stone Container's failure to suspend Evans before discharging him, because Stone Container made a blanket decision to not enforce the suspension components of the progressive discipline provisions and because Evans was repeatedly told that his employment was on the verge of being terminated.  Although courts have held that an employer's failure to follow its rules can constitute proof of pretext, this holding is inapplicable in the case at bar because other employees not of plaintiff's protected class were treated the same.  *Compare Bass v. Board of County*

31

*Commissioners*, 242 F.3d 996 (11th Cir. 2001), *with Gilbert v. West Georgia Medical Center*, 784 F.2d 402 (11th Cir. 1986). Stone Container consciously decided to fully abandon and disregard the suspension provisions of the attendance policy, and thus the failure of Stone Container to suspend Evans prior to discharging him does not constitute pretext, and it does not constitute disparate treatment.

"[A] disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." *Hazen Paper Company v. Biggins*, 507 U.S. 604, 610 (1993). Though Evans offers comparators to demonstrate that white employees were treated more favorably, Evans fails to create a genuine issue of material fact in rebuttal to Stone Container's explanations for its employment decisions, and he fails to establish that his race played any sort of role in Stone Container's decisions. Evans also fails to establish any connection between any erroneous and inaccurate record-keeping at Stone Container that is sufficient to warrant denial of Stone Container's Rule 56 motion. Consequently, the court finds that Evans has not raised a genuine issue of material fact regarding whether Stone Container's proffered reasons for discharging Evans are pretextual. The court therefore finds that there is no genuine issue regarding the legitimacy and non-discriminatory nature of Stone Container's

32

reasons for discharging Evans and that Stone Container is entitled to judgment as a matter of law.

### III.   CONCLUSION

For the foregoing reasons, summary judgment for Stone Container is due to be granted on all claims.  A separate and appropriate order will be entered.

DONE this ___1st___ day of April 2002.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE